Estate of J. Rollin French, Deceased, Jack Douglas French, Executor v. Commissioner.
Estate of J. Rollin French v. Commissioner
Docket No. 10168.
United States Tax Court
1948 Tax Ct. Memo LEXIS 159; 7 T.C.M. (CCH) 388; T.C.M. (RIA) 48115; June 23, 1948
Walter L. Nossaman, Esq., 433 S. Spring St., Los Angeles 13, Calif., and Charles M. Walker, Esq., for the petitioner. Earl C. Crouter, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Involved in this proceeding is a deficiency in estate tax of $26,658.28 against the Estate of J. Rollin French, hereinafter referred to as decedent. Certain adjustments having been conceded by petitioner, and some issues reserved for settlement under Rule 50 computation, the sole litigated question is whether respondent correctly determined that certain assets were the community property of decedent and his wife, and hence includible in decedent's estate under Internal Revenue Code, section 811 *160 , as against petitioner's contention that the assets were the separate property of decedent's wife. Some of the facts have been stipulated. Findings of Fact The stipulated facts are hereby found accordingly. Decedent died testate, a resident of Los Angeles, California, on September 28, 1943. He was then 63 years of age. In 1909 he married Effie D. French, who survived him and became executrix of his estate. They lived continually in Los Angeles County to the date of his death. Their two sons, Jacks Douglas French and Robert D. French, have also survived decedent. The former, named as alternate executor, is now the executor of the estate. [1]
The estate tax return was filed for the estate with the collector for the sixth district of California, disclosing a gross estate of $54,175.35, a net estate of $51,904.98, and no tax due thereon on account of the statutory exemption. The deficiency determined by respondent results from several adjustments, the ones contested in this proceeding being the inclusion in *161 decedent's estate as community property of (1) 561 shares of Golden State Investment Corporation in the amount of $36,408.90; (2) a note of the corporation payable to Effie French in the amount of $2,000, with accrued interest of $120; (3) "the full fair value of annuities," due under five insurance policies, which decedent's wife was to receive during her lifetime, valued at $51,292.88. The items were determined by respondent to have been "the community property of decedent and his wife" and as such includible in decedent's gross estate under section 811 (a) and (e) of the Internal Revenue Code, as amended. Decedent was a doctor of medicine, having commenced his practice in 1909. It was extensive and lucrative. He continued as a practitioner until about 1921, when he and Dr. C. E. Early established an industrial hospital which came to be known as the Golden State Hospital. Thereafter decedent devoted himself professionally almost entirely to hospital administration and certain related problems in the field of industrial medicine. He continued in the hospital business with Early until about 1928 when he acquired the latter's interest. Up to that time, the venture was profitable, *162 but thereafter, as a result of competition from a hospital established by Early, profits diminished. In 1937 decedent disposed of the hospital and the name to Early, and discontinued his activities in hospital administration. Then the Golden State Investment Corporation, as successor to the hospital corporation, was "established" as a "holding corporation" for decedent and his family, to facilitate the "handling of personal assets"; and decedent became occupied almost exclusively with its activities. Commencing in about 1912, and continuing until he acquired an interest in the hospital in about 1921, decedent turned over to his wife as her separate property a portion of his earnings, which she invested in stocks and bonds, and later reinvested in real property. The funds were given to her for the purpose of protecting her future in the event the hospital venture, which decedent considered financially uncertain and speculative, proved unsuccessful. The securities and later the real property stood in the name of decedent's wife. In September and October, 1937, decedent joined in deeds with his wife in the transfer of five parcels of real estate to the investment corporation in exchange *163 for 1,000 shares of stock issued to decedent's wife, of which 561 shares form part of the subject of dispute in this proceeding. The real estate, which included the family home, was all held prior to the exchange in the name of decedent's wife, having been acquired at various times. Some of the parcels had been acquired by transfer from decedent; others by decedent's wife out of decedent's earnings which he had theretofore turned over to her as hereinabove recited. The five parcels were taken on by the corporation in exchange for stock at the following values: Date acquired
Value at which taken by corpo-
Parcel
by Mrs. French
Grantor
ration in exchange for stock
No. 1 (7289 Frank-
5/27/36
Union Bank & Trust Co.
$80,192.60
(net, after
deducting
lin Ave.)
(J. R. French also quit-
$27,500
encumbrance)
claimed to Mrs. French
6/1/36)
No. 2 (1800 S. Har-
5/ 5/27
Blanche L. Deibler
$10,113.35
vard Boulevard)
No. 3 (1818 S. Har-
3/ 8/12
J. R. French (Lot 77)
$14,000.00
vard Boulevard)
(Lot 77)
3/17/17
May C. and Charles L. Giv-
(Lot 78)
ernaud (Lot 78)
No. 4 (463 Bixel
2/10/33
Lincoln Investment Co.,
Ltd.
$14,357.89
Street) No. 5 (Lot 459 Tract
6/ 3/25
Fanny C. Neill
$ 1,200.00
1719)
*164 The first four properties were described by decedent in a letter to his attorney, dated August 10, 1937, as belonging to his wife, and for that reason "the one thousand shares issued should be in her name. Inasmuch as none of it is my property, no shares are to be issued to me." All of the five properties were detailed in exhibits attached to the application for permit to issue stock filed with the California Commissioner of Corporations shortly thereafter. The application sought permission "to issue and sell * * * 1,000 * * * shares of its common stock to Effie D. French, in exchange for the transfer and conveyance by said Effie D. French to the corporation of the real property heretofore referred to." Decedent, as president of the corporation, signed and swore to the application. From 1923 through 1942 decedent made thirteen statements of "Financial Condition," some in his name alone, and some in his name and his wife's, to a Los Angeles bank for purposes of securing loans. Listed among the assets in some instances as held "in name of myself and wife" were securities and real estate which are now claimed as the wife's separate property. For the years 1937 through 1943 decedent *165 and his wife reported the receipt of dividends on the stock, together with other income, including annuity payments on life insurance policies, hereafter more fully described, on a community property basis. This was a change of method from that previously employed, and resulted from conversation between decedent and his auditor, who gave a rough explanation to the former of the nature of community and separate property and the basis upon which income tax returns on a community property basis could be filed. Decedent acquiesced in the manner in which the returns were made. Decedent generally checked his tax returns carefully as to the items included in income and deductions. On February 11, 1946, after receipt of the deficiency notice and the filing of the petition in this preceding, upon advice of tax counsel, amended tax returns for those years not utilizing a community property basis were filed for decedent and his wife. A comparison of these amended returns with those filed on a community property basis shows that in the aggregate decedent's wife paid more tax by utilizing the community property basis, and that decedent's tax liability remained unchanged. On the same date *166 as his death, decedent, as vice-president of the corporation, signed a check payable to his wife in the amount of $2,120. On the face of the check were the remarks that it was in "payment of note 2000.00 - inter - at 6% 120.00." The corporations books reflected receipt of $2,000 from Effie French on August 6, 1942, which was carried in a notes payable account. From 1915 to 1927 decedent purchased with funds of the marital community five policies from The Penn Mutual Life Insurance Company, three providing for monthly annuities, commencing in years beginning with 1935, if the insured were living, and continuing for a fixed period of months thereafter. Two were endowment policies, which included at the insured's option the annuity feature, and were by him so changed. In November, 1935, in two instruments captioned "ABSOLUTE ASSIGNMENT," decedent, joined by his wife, assigned to her for life and then to her sons all of his interest in the policies as provided in the instruments. In decedent's gift tax return for 1935 he reported as a gift to his wife the assignment of the policies; the annuities received, however, for the years 1937 - 1943 were reported for income tax purposes *167 on a community property basis. The 561 shares of stock, the annuities, and the sum of $2,150, all hereinabove referred to, were the separate property of decedent's wife at the time of his death. Opinion The record as a whole adequately sustains petitioner's contention that the property in question was the wife's separate property and hence not includible in decedent's estate as assets of the marital community. We have set forth in our findings the ultimate conclusion so arrived at on the question of fact which, as the parties agree, is the only issue presented. There were, it is true, certain statements of financial conditions over a period of years indicating that decedent did not too nicely discriminate between his property and that of his wife. But the statements are so inconsistent with each other and so lacking in significance at the time they were made that the most reasonable explanation seems to be complete confidence on the part of decedent that the family property, whether actually that of himself or his wife, could be commingled for purposes of obtaining bank credit. Certainly the basic records, including particularly the form in which title was taken, the execution *168 of the various deeds of transfer, and decedent's own conduct, generally contemporaneous as they were with the period during which the statements were being filed, are as inconsistent with any claim of ownership on decedent's part as they are persuasive against it. The one element upon which respondent dwells at greatest length is the filing for the six years beginning in 1937 of Federal tax returns, reporting the proceeds of the property in question as community income. Of equal consequence to us, however, is the fact that for many preceding years the same income had been reported as that from separated property. The explanation for the change was that a new accountant was employed to prepare the returns, and that he did so without adequate assurance from decedent that he grasped the significance of filing returns on a community basis. Such a situation is not necessarily fatal, particularly when explained, as it is here. Estate of J. Harold Dollar, 41 B.T.A. 869. Attaching importance to the whole history of the form adopted for submitting income tax returns to the Federal government requires as a point of departure that the property in question was part of the wife's *169 separate estate, since that assumption is the only one consistent with the repeated filing of separate returns over the long period prior to 1937. If that is so, some act of the parties was necessary to justify a finding of transformation from separate into community property. This could, of course, have been accomplished by an agreement of the parties at that time. See Samuel Friedman, et al., 10 T.C. 1145 (decided this day); Kenney v. Kenney, 220 Cal. 134, 30 Pac. (2d) 398. But in addition to the wife's unequivocal testimony that no such arrangement occurred, decedent's conduct, as demonstrated by the record, shows that at about this time a means, if anything more definitive, of segregating the property in the wife's ownership was undertaken. If, therefore, these assets belonged exclusively to the wife before 1937, the conclusion that they did so thereafter is even more decisively established. There may well be situations where a taxpayer may not be heard to assert a fact favorable to him, if by representation to the contrary he has obtained a tax advantage to the detriment of the revenue. Estate of George Kingdon, 9 T.C. 838. But this is *170 a subject on which we need not and in fact may not dwell, since the plea of estoppel is one that must be made affirmatively, and none has been advanced here. El Dorado Oil Works, 46 B.T.A. 994. Such consequence as might ordinarily attach to the inconsistent behavior of decedent in connection with his tax returns is thus eliminated by respondent's failure to raise the issue. That omission in turn we ascribe to the absence of injury, as demonstrated by petitioner's evidence. No damage to the revenue resulted from the method of filing, which was in fact remedied by amended returns showing that by and large the tax under the erroneous returns had been overpaid. We accordingly conclude that petitioner has sustained its burden of proof that the property in question was in fact the separate property of decedent's wife. If any point were to be made that a part of the property in dispute was originally policies of insurance, taxable under section 811(g), even though converted into annuities, it would be answered by the showing that long prior to 1941 the policies were transferred in full without the retention of any incidents of ownership in decedent; and that subsequent to *171 January 10, 1941, no premiums thereon were paid by him. See Estate of Herman D. Brous, 10 T.C. 597, (April 13, 1948). Decision will be entered under Rule 50. Footnotes
1. By order of the Tax Court, dated January 15, 1948, Jack Douglas French, as executor, was substituted as party petitioner in place of Effie D. French, Executrix.↩